Gulf Oil Corporation *v.* Mays, Appellant.

Argued April 26, 1960. Before Jones, C. J., Bell, Musmanno, Jones, Cohen and Eagen, JJ.

414

reargument refused November 22, 1960.

*George B. Balmer,* with him *Raymond C. Schlegel, Harry W. Speidel,* and *Snyder, Balmer & Kershner,* for appellant.

*John T. Clary,* with him *Richard A. Bausher, George B. Clothier, Roy D. Jackson, Jr.,* and *Stevens & Lee,* and *Obermayer, Rebmann, Maxwell & Hippel,* for appellee.

OPINION BY MR. JUSTICE COHEN, October 10, 1960:

On September 15, 1955, Claude E. Mays purchased a gasoline service station in Berks County and began trading as Mays Gulf Service (Mays). On the same date Mays and Gulf Oil Corporation (Gulf) entered into a sales agreement whereby Mays agreed to purchase from Gulf *all* his requirements of "Gulf motor fuels" for resale at his gasoline station but not "less than 90,000 gallons of such motor fuels per annum." The contract was to extend fifteen years.

From the time the sales agreement was entered into until the time of hearing in the court below, Mays purchased more than the minimum required gallonage of Gulf motor fuels each year.

When Mays and Gulf entered into the sales agreement, Gulf had no Fair Trade agreements with any of its retail dealers. On January 12, 1959, Gulf, act-

ing pursuant to the Pennsylvania Fair Trade Act,[1] entered into Fair Trade agreements with its retail dealers establishing minimum retail prices for the sale of Gulf motor fuels.[2] Mays did not sign an agreement with Gulf. Each nonsigning retail dealer, including Mays, was duly notified that Gulf had entered into these agreements with other dealers and advised of the terms thereof. *All* Gulf's retail dealers, including those who had not signed agreements, with the exception of Mays, observed and complied with the stipulated prices.

Despite warnings by Gulf, Mays continued to sell such fuels at prices one cent less than the stipulated prices.

On March 26, 1959 Gulf filed an equity action against Mays in the Court of Common Pleas of Berks County seeking to enjoin him from continuing to sell Gulf motor fuels at less than the stipulated prices. After a hearing, a preliminary injunction was denied. The matter then went to final hearing and, on December 30, 1959, a final injunction decree was entered by a divided court. This decree permanently enjoined Mays from selling Gulf motor fuels at less than the stipulated prices and is the basis of this appeal.

Mays' contentions are three-fold: (1) by reason of the sales agreement of 1955, etc., Mays became a dealer in a "captive" status and hence not within the Fair Trade Act provision; (2) in the absence of proof of any specific damage caused by Mays' sales of Gulf motor fuels at less than the stipulated prices, Gulf is not entitled to injunctive relief; (3) the chancellor erred in his refusal to permit Mays to show that in

---

[1] Act of June 5, 1935, P. L. 266, as amended by the Act of May 25, 1956, P. L. (1955) 1756, §1, 73 PS §§7, 8.

[2] Of 1846 retail dealers in Pennsylvania, 1546 signed agreements; of 63 dealers in Berks County, 56 signed agreements.

1958—prior to Gulf's Fair Trade agreements—when he sold Gulf motor fuels at Gulf's then recommended prices, he suffered a loss of business.

The accepted purpose of a fair trade act "is to prevent predatory price-cutting and cutthroat competition, and to protect owners and public alike against unfair practices in the distribution of articles of standard quality under a distinguished brand or mark." *Sinclair Refining Company v. Schwartz,* 398 Pa. 60, 63, 157 A. 2d 63 (1959). Such legislation has withstood the challenge of transgressing the "due process" and "equal protection" clauses of the 14th Amendment on the ground that it is an appropriate exercise of the state police power reasonably calculated to prevent price-cutting and "loss-leader" practices which debase the good-will of a product known by its brand or trademark, injuring both the distributor and public in general. *Old Dearborn Distributing Co. v. Seagram-Distillers Corp.,* 299 U. S. 183, 57 S. Ct. 139, 81 L. ed. 109 (1936).

Under the Pennsylvania Fair Trade Act, both "signers" and "non-signers"[3] alike are bound to observe the minimum resale price set by a fair-trade distributor when a valid fair-trade contract has been entered into within the Commonwealth. Legitimization of such contracts, however, is completely dependent upon strict compliance with the Pennsylvania Fair Trade Act, and, where interstate commerce is affected, there must also be compliance with the federal fair-trade legislation, since both at common law and under the Sherman Anti-Trust Act minimum resale price maintenance contracts were held to be illegal per se as unreasonable restraints of trade. *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U. S. 373, 31 S. Ct. 376, 55 L. ed. 502 (1911) ; *Schwegmann Bros. v.*

---

[3] Pennsylvania Fair Trade Act, supra, note 1, 73 PS §8.

*Calvert Distillers Corp.*, 341 U. S. 384, 71 S. Ct. 745, 95 L. ed. 1035 (1951).

Since the appellee is engaged in interstate commerce its fair trade program must first be exempted from federal condemnation by the Miller-Tydings Amendment of §1 of the Sherman Act[4] and the Mc-Guire Amendment of §5(a) of the Federal Trade Commission Act,[5] in order that the Pennsylvania Fair Trade Act may validly apply, *United States v. McKesson & Robbins, Inc.*, 351 U. S. 305, 310-311, 76 S. Ct. 937, 100 L. ed. 1209 (1956); *Schwegmann Bros. v. Calvert Distillers Corp.*, supra; *Esso Standard Oil Company v. Secatore's, Inc.*, 246 F. 2d 17 (1st Cir.) cert. denied, 355 U. S. 834, 78 S. Ct. 54, 2 L. ed. 2nd 46 (1957), as well as comply with the Pennsylvania statute. Cf. *Burche Co. v. General Electric Company*, 382 Pa. 370, 115 A. 2d 361 (1955).

The Miller-Tydings Amendment, and in almost identical language the McGuire Amendment, provides, in relevant part, that the federal antitrust legislation shall not "render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trade mark, brand, or name of the producer or distributor of such commodity and *which is in free and open competition with commodities of the same general class produced or distributed by others,* when contracts or agreements of that description are lawful as applied to intrastate transactions, under" the applicable state law. But both amendatory acts provide that the grant of immunity from federal proscription "shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved . . . *be-*

---

[4] 50 Stat. 693 (1937), 15 U.S.C.A. §1.

[5] 66 Stat. 632 (1952), 15 U.S.C.A. §45(a).

tween persons, firms or corporations in competition with each other." The Pennsylvania Act provides: "No contract relating to the sale or resale of a commodity which bears, or the label or content of which bears, or the vending equipment from which said commodity is sold to the consumer bears the trademark, brand or the name of the producer or owner of such commodity, and *which is in fair and open competition with commodities of the same general class produced by others,* shall be deemed in violation of any law of the State of Pennsylvania. . . ." (Emphasis supplied).

In the instant case, the sole consideration given to the aspect of competition between the parties or competition of the product with others in its class is the assertion by the appellee in its complaint that "Gulf brand gasoline is sold to the consuming public by retailers, including defendant, from vending equipment which bears Gulf's trade marks and brands, and is in fair and open competition throughout Pennsylvania with gasolines of the same general class produced by others" and the admission thereto by the appellant in his answer. The record is otherwise devoid, undoubtedly because of the admission, of any evidence which shows the assertion to be the fact. Even though the admission here is made in an adversary proceeding, still the state's interest in seeing that unlawful price fixing is not indulged in is of such importance that the mere admission by the adversary is not sufficient to provide the essential prerequisites necessary to invoke the statutory rights and exemptions provided by the act.

It is important to bear in mind that absent the protective federal and state legislation minimum resale price maintenance contracts will be unenforceable as contrary to our basic anti-monopoly philosophy of unfettered competition in the market of goods and serv-

ices. Eminent authorities are highly critical of this exempting legislation on the grounds that it relieves distributors whose inventory consists largely of "fair-trade" products from the pressures and tribulations of price competition, and in general facilitates price fixing efforts on the manufacturing and distributive levels, contrary to the most elementary principles of a dynamic free enterprise system.[6] The inclusion in the Fair Trade Acts of the provisos that the commodity must be "in free and open competition" with similar products and that competitors could not enter into fair trade agreements was to assure that these dangers of horizontal price fixing would be held to a minimum. Accordingly, in order to protect the consuming public from any possible price exploitation, it is of the utmost importance that the distributor seeking the benefits of fair trade establish in fact that he has complied with these statutory prerequisites.

So far as gasoline distributors are concerned, such proof is not without difficulties. In *Esso Standard Oil Company v. Secatore's, Inc.*, supra, the gasoline company not only supplied its gasoline to retail dealers but also sold direct to some ultimate consumers consisting mostly of operators of fleets of trucks. The court concluded that the gasoline company was in competition with the "non-signer" retailer defendant who also did substantial business with operators of fleets of motor vehicles, and held that retail price maintenance agreements between the gasoline company and third parties were illegal under the federal legislation and could not therefore be enforced under the "non-signer" provision of the State Fair Trade Act against the defendant.

---

[6] See, e. g., Report of the Attorney General's National Committee to Study the Antitrust Laws, pp. 149-54 (1955); Herman, A Note on Fair Trade, 65 Yale L. J. 23 (1955).

420

It also seems that in a given geographic area practically all the major brands of gasoline are sold at the same price. The federal courts have long held that business behavior which results in approximating competitor's prices is admissible circumstantial evidence from which the fact-finder may infer agreement between the parties. *Theatre Enterprises, Inc. v. Paramount Filming Distributing Corp.*, 346 U. S. 537, 74 S. Ct. 257, 98 L. ed. 273 (1954). If there is so-called "conscious parallelism" in fixing gasoline prices, it is certainly probative evidence that in fact gasoline is not sold in free and open competition. Since these conditions and circumstances prevail at least to some extent in the distribution of gasoline products, it is incumbent upon the appellee here to prove to the satisfaction of the court that it is not engaged in competition similar to that in *Secatore's, Inc.*, and that it is not a party to any agreement or conspiracy to fix prices.

Since the record must be remanded for further proceedings, some other matters deserve comment. By its very nature, the gasoline industry does not clearly appear to be appropriately suitable for fair-trade usages. Virtually all retail service stations sell but one brand of gasoline, which, for all practical purposes, is their major product. There is little possibility of "loss-leader" selling by single product retailers. Apparently, gasoline companies buy and sell each other's gasoline when temporary shortage conditions prevail, or to shortcut transportation costs, or to remove "wildcat" surpluses from the market, or for sundry other reasons. If the gasoline sold is other than that of the company's whose name appears on the pump, little argument can be made that the prestige of the trade mark or brand is being protected. When these two basic reasons for fair trade are removed from consid-

eration, the result is that the price and not the product is being protected. In such circumstances, grave problems arise as to whether a "non-signer" can constitutionally be bound to follow fair-trade restrictions. See *Burche Co. v. General Electric Company*, supra, wherein this Court sustained the constitutionality of the "non-signer" provision on the basis of the *Old Dearborn* decision.

It is quite true that this Court has decided that "gasoline" as a commodity is within the protection of our Fair Trade Act under a literal reading of its provisions: *Sinclair Refining Company v. Schwartz*, supra. Indeed, the addition to our act of the phrase "or the vending equipment from which that commodity is sold to the consumer bears," by separate amendment in 1941, Act of June 12, 1941, P. L. 128, leaves little doubt that our legislature intended fair-trade coverage to include the gasoline industry. We did not, however, decide in the *Sinclair* case whether consistently with the Constitution a "non-signer" could be forced to obey a fair-trade program set by a gasoline company, nor did we investigate whether the overriding federal legislation exempted gasoline from antitrust condemnation. The *Sinclair* decision went only so far as to dissolve a preliminary injunction pending a full hearing because the gasoline company did not show irreparable harm and failed to advance sufficient evidence showing that its product was "in fair and open competition with" gasoline of other producers. Before lending the power of equity to a program protecting resale prices of a product, widely used by the consuming public, the court below must thoroughly examine this problem of whether a gasoline company may validly resort to fair trade privileges.

The decree of the court below is reversed, and the case is remanded for further proceedings consistent with this opinion.

DISSENTING OPINION BY MR. JUSTICE BENJAMIN R. JONES:

On September 15, 1955, Claude E. Mays, trading as Mays Gulf Service (Mays), with the financial assistance of Gulf Oil Corporation (Gulf), purchased a gasoline service station in Reiffton, Berks County. To finance this transaction Mays borrowed $25,000 from the Mellon National Bank and Trust Company. This loan was evidenced by two notes signed by Mays: one note for $6928.75 payable in five years and another note for $18,071.25 payable in fifteen years, both notes bearing interest at three and one-half (3½%) percent annually. Mays' obligation to the Mellon Bank was unconditionally guaranteed by Gulf.

To secure Gulf's guaranty, Mays and his wife gave Gulf a mortgage, with accompanying bond, for $25,000 covering the gasoline station. On the same date, Mays and Gulf entered into two other separate agreements: a *sales* agreement and a *lease option* agreement. Under the *sales* agreement Mays agreed to purchase over a period of fifteen years *all* his requirements of "Gulf motor fuels" for resale at his gasoline station but not "less than 90,000 gallons of such motor fuels per annum". Under the *lease option* agreement[1] Mays and his wife gave to Gulf "an irrevocable option" to lease the gasoline station for $200 per month, the option being for a fifteen year period and to be exercised upon the happening of any one or more certain specified conditions.[2]

---

[1] The purpose of this agreement apparently was to insure uninterrupted operation of the station and avoid the necessity of any foreclosure.

[2] If Mays and his wife should cease to operate the station; if they should breach the *sales* agreement; if the *sales* agreement should terminate, by operation of law or other cause not attributable to Gulf, or by mutual consent.

From the time the *sales* agreement was entered into until the time of hearing in the court below Mays has purchased each year more than the minimum required gallonage of Gulf motor fuels.[3]

At the time Mays and Gulf entered into the *sales.* agreement, Gulf had no Fair Trade agreements with any of its retail dealers. On January 12, 1959, Gulf, acting pursuant to the Pennsylvania Fair Trade Act,[4] entered into Fair Trade agreements with its retail dealers establishing minimum retail prices for the sale of Gulf motor fuels.[5] Mays did not sign an agreement with Gulf. Each non-signing retail dealer, including Mays, was duly notified that Gulf had entered into these agreements with other dealers and advised of the terms thereof.[6] *All* Gulf's retail dealers, including those who had not signed agreements, with the exception of Mays, observed and complied with the stipulated prices.

Despite warnings by Gulf, Mays continued to sell such fuels at prices one cent less than the stipulated prices.[7]

---

[3] During 1958, Mays purchased from Gulf more than 220,000 gallons which it resold to its customers and, in May 1959, Mays' sales exceeded 24,000 gallons.

[4] Act of June 5, 1935, P. L. 266; Act of June 12, 1941, P. L. 128, No. 66, as amended; Act of May 25, 1956, P. L. (1955), 1756, 73 PS §§7, 8.

[5] Of 1846 retail dealers in Pennsylvania, 1546 signed agreements; of 63 retail dealers in Berks County, 56 signed agreements.

[6] Paragraph 7 of Mays' answer admits receipt of such notice.

[7] Paragraph 8 of Gulf's complaint avers that Mays wilfully and knowingly advertised, offered for sale and sold at retail Gulf brand gasolines at prices lower than those established under the Fair Trade Agreements; that thereafter [despite two warning notices] Mays "still continued wilfully and knowingly to advertise, offer for sale and sell Gulf Brand Gasoline at less than the applicable minimum retail prices" established by Gulf. The corresponding paragraph of Mays' answer admits receipt of the warn-

On March 26, 1959 Gulf filed an equity action against Mays in the Court of Common Pleas of Berks County seeking to enjoin Mays from continuing to sell Gulf motor fuels at less than the stipulated prices. After a preliminary hearing, a preliminary injunction was denied. The matter then went to final hearing and, on December 30, 1959, a permanent injunction was granted by a divided court.[8] This decree permanently enjoined Mays from selling Gulf motor fuels at less than the stipulated prices. That decree is the basis of this appeal.

The majority of this Court would now reverse this decree and remand the record to the court below for further testimony upon the ground that Gulf has not shown its right to obtain equitable relief against a "non-signer" price cutter under the Fair Trade Act. The rationale of the majority opinion is that Gulf failed to prove that its gasoline was "in free and open competition with commodities of the same general class produced or distributed by others".

In its complaint Gulf alleged that "Gulf brand gasoline is sold to the consuming public by retailers, including defendant, from vending equipment which bears Gulf's trade marks and brands, and is in fair and open competition throughout Pennsylvania with gasolines of the same general class produced by others". *Mays in his pleading admitted this averment.* The majority opinion takes the unique position that the Commonwealth[9] has an interest "in seeing that unlawful price fixing is not indulged in" and that, by reason

ings from Gulf and admits that Mays continued, after receipt of such notices, to advertise, offer for sale and sell Gulf brand gasolines at one cent less than the prices set forth in the notices.

[8] Judges SHANAMAN and READINGER voted for the injunction. Judge HESS filed a dissenting opinion.

[9] The Commonwealth is not a party to this litigation.

of such interest on the part of the Commonwealth, it was encumbent upon Gulf, *even though Mays admitted such fact*, to prove that its gasoline was "in fair and open competition with commodities of the same general class produced by others". In other words, the generally accepted principle that a properly alleged fact averred in a complaint and admitted in the adversary's answer must still be proved if the Commonwealth— although not a party to the litigation—has a paternal interest therein.

The chancellor found: "5. Gulf brand gasoline is in fair and open competition with commodities of the same general class". The fact was averred in the complaint, admitted by the answer thereto and such portion of the pleading was admitted, with propriety and without objection, into the record of this case. No principle of law has been more frequently reiterated or more constantly adhered to by this Court than the rule that findings of fact by a chancellor, approved by the court en banc, will not be reversed by an appellate court if there is adequate evidence to sustain them: *Whitehall Laboratories v. Wilbar,* 397 Pa. 223, 235, 236, 154 A. 2d 596; *Masciantonio Will,* 392 Pa. 362, 367, 141 A. 2d 362; *McRobert v. Phelps,* 391 Pa. 591, 597, 138 A. 2d 439; *DeLuca v. DeLuca,* 388 Pa. 167, 168, 130 A. 2d 179. The present majority opinion completely ignores this well-established and salutary principle of law.

The majority opinion takes the position that there must be evidence upon this record, *aside from the admission in the pleadings,* to sustain the chancellor's finding of fact, a position novel, unique and without precedent in our law. While there was no oral testimony to establish the fact of "fair and open competition" there was no necessity for any such testimony inasmuch as that fact had been expressly conceded:

*Commonwealth Trust Company v. Cirigliano,* 352 Pa. 108, 112, 41 A. 2d 863; *Allegany Gas Company v. Kemp,* 316 Pa. 97, 110, 174 A. 289; *Acme Realty, Inc. v. Lafayette Building & Loan Association,* 134 Pa. Superior Ct. 384, 391, 4 A. 2d 240. An admission of fact contained in a pleading upon which a party goes to trial is conclusive against him (*Lacaria, Administrator v. Hetzel,* 373 Pa. 309, 313, 96 A. 2d 132; *Wilkinsburg Real Estate and Trust Company v. Lewis,* 173 Pa. Superior Ct. 372, 377, 98 A. 2d 746; *Mack v. Reading Company,* 173 Pa. Superior Ct. 296, 298, 98 A. 2d 399) and such fact is binding upon the reviewing court (*McDonald Construction Co. v. Gill et al.,* 285 Pa. 305, 307, 308, 132 A. 368; *Bush v. Atlas Auto Finance Corp.,* 129 Pa. Superior Ct. 459, 466, 467, 195 A. 757). A search of the reported cases in this area of the law reveals not a single instance in which this Court has reversed a finding of fact based upon an admission in the pleadings. The reason for the absence of any such authority is readily apparent.

The chancellor's finding of fact that Gulf gasoline was "in fair and open competition with commodities of the same general class" was fully justified by the record. The record further supports a finding that Gulf has by proper *pleading* and *proof* established its rights to the privileges of the Fair Trade Act (Act of June 5, 1935, P. L. 266, as amended by the Act of May 25, 1956, P. L. (1955) 1756, §1, 73 PS §§7, 8) and has adequately exhibited its right to obtain the necessary equitable relief.

Furthermore, the majority opinion states that it has "serious misgivings" concerning other matters in connection with this litigation and proceeds to render doubtful the authority of certain aspects of *Sinclair Refining Co. v. Schwartz,* 398 Pa. 60, 63, 157 A. 2d 63 (decided within the last nine months). In my opinion,

the principles enunciated in *Sinclair* are correct and should not be disturbed in any respect. To cast doubt on *Sinclair* can only create uncertainty and confusion in this area of the law.

I disagree with the opinion of the majority of the Court in this case. In my opinion, the majority's determination is without precedent and completely ignores principles of law adhered to for many years by this Court, and, therefore, I dissent.

Mr. Justice BELL joins in this opinion.