SCHERING CORPORATION, a New
Jersey Corporation

v.

MARTIN WHOLESALE DISTRIBU-
TORS, INC., a Pennsylvania Corpora-
tion, a/k/a Wholesale City and Whole-
sale City Store.

Civ. A. No. 31979.

United States District Court
E. D. Pennsylvania.

Dec. 28, 1962.

James F. McMullan, James F. Mc-Mullan, Jr., of Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for plaintiff.

I. Raymond Kremer, Philadelphia, Pa., for defendant.

FREEDMAN, District Judge.

Plaintiff is engaged in the manufacture and sale of drugs and pharmaceutical products, among them a cold remedy "Coricidin". It seeks a preliminary injunction restraining defendant from selling Coricidin, which is a trademarked product, below its fair trade price.

At the hearing there was no dispute that plaintiff had established a fair trade price for its Coricidin products (N.T. 3), as required by the Pennsylvania Fair Trade Act (Act of June 5, 1935, P.L. 266 §§ 1, 2, as amended, 73 P.S. §§ 7, 8). Nor was there any dispute that defendant had made sales of Coricidin at less than the fair trade price. (N.T. 60–1). A number of questions were, however, earnestly pressed by the defendant.

1. Diverse citizenship of the two corporations, plaintiff and defendant, has been conceded. (N.T. 61). But because the sales of Coricidin shown to have been made by defendant at cut prices amounted only to about $1,000 and its profit to about $200 (N.T. 127), defendant maintains that the requisite amount in controversy of $10,000 has not been proven.

The jurisdictional amount is to be determined by the value of the property right which is being invaded, rather than the size of the individual act of invasion.[1] This principle is particularly applicable to fair trade cases. For the general purpose of these statutes as stated by the Supreme Court of Pennsylvania is "to prevent price-cutting and 'loss-leader' practices which debase the good-will of a product known by its brand or trademark, injuring both the distributor and public in general". Gulf

---

1. Ambassador East, Inc. v. Orsatti, Inc., 257 F.2d 79 (3d Cir., 1958); John B. Kelly, Inc. v. Lehigh Nav. Coal Co., Inc., 151 F.2d 743 (3d Cir., 1945), cert. denied, 327 U.S. 779, 66 S.Ct. 530, 90 L. Ed. 1007 (1946).

Oil Corp. v. Mays, 401 Pa. 413, 416, 164 A.2d 656 (1960). The jurisdictional amount in such a suit is not the amount of the defendant's unlawful sales, but rather the value of plaintiff's goodwill and trademarks which are being injured by such sales.[2]

The testimony, which I accept, shows that during the past five years plaintiff has expended approximately $5,000,000 per annum in the furtherance of its general advertising program, of which approximately $400,000 per annum has been for advertising Coricidin products. I find, therefore, that the value of the goodwill and trademarks which plaintiff is seeking to protect is in excess of $10,-000.[3]

2. Defendant argues that Coricidin is not in "fair and open competition with commodities of the same general class produced by others", as required by the Pennsylvania Act and by the Federal legislation which authorized the states to pass fair trade acts.[4] The manifest purpose of limiting the protection of the Fair Trade Act to products which are in fair and open competition with other products of the same general class is to prevent the evils of price fixing. Since the requirement evidences a basic public policy, the Penn-sylvania decisions have declared it to be the duty of the courts to maintain it. Hence the admission of the defendant,[5] or even the stipulation of both parties,[6] that the commodity is in fair and open competition is not enough. The court must be satisfied that such competition exists.

I am satisfied that Coricidin is in fair and open competition with commodities of the same general class produced by others. A substantial number of such commodities were referred to in the evidence. There was much discussion regarding their chemical composition and the enigmatical aetiology of the common cold. We deal here not with scientific determinations but rather with the practical question of the conduct of consumers who seek cold remedies and the products which are available for such purpose. Judged by this standard the evidence of competition is clear.

3. Defendant's final argument is that the strong remedy of a preliminary injunction should not be made available to the plaintiff in the present case because (a) the harm to the defendant's small business would outweigh any benefit which plaintiff might obtain, (b) plaintiff has in the past failed to enforce the fair trade price policy which it now

2. Parke, Davis & Co. v. Jarvis Drug Co., Inc., 208 F.Supp. 350 (S.D.N.Y.1962); Johnson & Johnson v. Wagonfeld, 206 F. Supp. 30 (S.D.N.Y.1960); Upjohn Co. v. Liberty Drug Co., Inc., 193 F.Supp. 701 (S.D.N.Y.1959).

3. In Johnson & Johnson v. Wagonfeld, 206 F.Supp. 30, 31 (S.D.N.Y.1960), in similar circumstances, the court said: " * * * since plaintiff has expended an average of over $5 million a year for domestic advertising over the last five years, the conclusion that its good will is worth at least $10,000. is amply warranted. * * *"

4. The Miller-Tydings Act (15 U.S.C.A. § 1) and the McGuire Act (15 U.S.C.A. § 45), which freed such state legislation from the prohibitions of the anti-trust laws, prescribe that the fair-traded commodity must be one "which is in free and open competition with commodities of the same general class produced or distributed by others * * *."

5. "Even though the admission here is made in an adversary proceeding, still the state's interest in seeing that unlawful price fixing is not indulged in is of such importance that the mere admission by the adversary is not sufficient to provide the essential prerequisites necessary to invoke the statutory rights and exemptions provided by the act.": Gulf Oil Corp. v. Mays, 401 Pa. 413, 418, 164 A. 2d 656, 659 (1960).

6. "Before a court can entertain an action for a preliminary injunction under Section 2 of the Act of 1935 (73 P.S. § 8), it must be established that the plaintiff-producer's products are in fair and open competition within the state. Parties cannot by agreement eliminate this requirement and confer power upon the court to enter an injunction despite lack of compliance with the statutory provision.": Gillette Co. v. Master, 408 Pa. 202, 212–213, 182 A.2d 734, 740 (1962).

seeks to apply against defendant, and (c) there is no showing of irreparable harm to plaintiff. These contentions may all be considered together.

■ The fact that the defendant's gross sales of plaintiff's products did not exceed about $1,000 and its profit on these sales was $100 to $200 does not stamp its conduct as so trivial that a court of equity should be unmoved by a prayer to enjoin it in the future. The basis of the enforcement of the fair trade policy is the prevention of debasement of a manufacturer's goodwill by repeated acts of violation. This is the essence of the rule that determines the amount in controversy by the value of the goodwill which is being impaired.[7] Moreover, however insignificant any one violation may be, it is the accumulated effect of the example of such violation going unchecked which constitutes the real injury. Indeed, in this case the defendant itself challenges plaintiff's right to a preliminary injunction because it claims that plaintiff has allowed other sales to be made without efforts to enforce compliance. It is clear, therefore, that whether an injunction is to be issued depends not merely on the size of the specific violation now before us, but also on its effect as part of a chain of violations with their accumulated erosion of plaintiff's goodwill. This is especially true in fair trade cases. For here the fact that the violation was small and the profit to the defendant unsubstantial is no justification for permitting defendant to continue in violation of the Pennsylvania statute and in flat disregard of the policy established by it.

■ Nor has the plaintiff been guilty of a failure to seek enforcement of its fair trade prices. Manifestly, the maintenance of prices in the face of price cutting requires first, knowledge of the violations and an opportunity to investigate them, then notice to the violator, followed by reference to counsel, and ultimately the determination to bring suit to enjoin the violation. All this takes time and it would be unrealistic to require that suit be brought for every violation as soon as it is uncovered. We must assume the likelihood of negotiations with the violator seeking amicable agreement to discontinue the illegal practice, and the belief that an injunction obtained in one case will be persuasive in obtaining voluntary discontinuance of other violations without litigation.

■ The evidence is clear that plaintiff is actively engaged in seeking to maintain its fair trade prices and that its efforts are both reasonable and diligent. (N.T. 138–49). There is no proof which would justify a conclusion that this has not been plaintiff's policy even in the past. But in any case, it is enough that plaintiff is vigorously pressing its efforts to maintain its fair trade prices; and the fact that there may have been violations in the past, or even are some now which plaintiff is undertaking to act against but has not yet enjoined, can constitute no defense to this defendant in the absence of any showing of intention to discriminate against him.[8]

■ Defendant earnestly contends, as an ultimate conclusion from the combined circumstances that the amount involved in defendant's sales is small, the plaintiff is a large corporation, and the probable existence of other violations, that therefore plaintiff has not made a showing of irreparable damage.

In Mead Johnson & Co. v. Martin Wholesale Distributors, Inc., 408 Pa. 12, 182 A.2d 741 (1962), the Supreme Court of Pennsylvania held that the underselling of products within the protection of the Fair Trade Act is unlawful and that "For one to continue such unlawful conduct constitutes irreparable injury. * * * The evil aimed at is not the underselling itself, but the assault made on the good name of the plaintiff's products and the goodwill engendered there-

---

7. Supra, at nn. 1, 2.

8. See Parke, Davis & Co. v. Jarvis Drug Co., Inc., 208 F.Supp. 350, 353 (S.D.N.Y. 1962); and Johnson & Johnson v. Wagonfeld, 206 F.Supp. 30, 32 (S.D.N.Y.1960).

by." (p. 16, 182 A.2d p. 743). I must, of course, exercise my independent judgment in determining whether irreparable damage has been shown. I think it has been shown here. Plaintiff is a nationally known drug manufacturer. Coricidin is a well-know cold remedy. I have found that the goodwill and trademarks relating to Coricidin have a value in excess of $10,000. The value is far more substantial than the statutory minimum. Just as the amount in controversy is determined not by the amount of an individual defendant's isolated sale but rather by the total value of the goodwill which is attacked by such sale, so also in determining the question of irreparable injury we must look not merely to the individual sale by a defendant but also to the consequence to the plaintiff of permitting it to go unchecked. A breakdown of plaintiff's policy of price maintenance because of numerous violations by small stores would, on defendant's theory, not constitute irreparable harm to the plaintiff because each case judged alone would appear too small to warrant the exercise of the strong remedy of a preliminary injunction. But we need not wait until the threat becomes a fact. Pennsylvania, under authority of Federal statutes, has adopted a law which expresses its public policy, however much views may differ as to its wisdom or desirability. By that policy the underselling of plaintiff's products is forbidden. Plaintiff is entitled to have this policy maintained against any violator, large or small; and damages for violation are far from an adequate remedy.[9]

▮ Although, as we have said, there is no dispute that plaintiff has established fair trade prices for its products, curiously enough a study of the record reveals that the fair trade contract between plaintiff and the dealer was never offered in evidence, although it is attached to the complaint as Exhibit 3. Nor was there offered in evidence that portion of paragraph 9 of the complaint which pleads the contract and avers that there were others like it. But paragraph 11 of the complaint was expressly admitted in the answer and was offered in evidence. That paragraph alleges that defendant was advised of plaintiff's fair trade policy and schedule of minimum prices, and there is attached as Exhibit 4 a copy of a letter from plaintiff to defendant. Exhibit 4 declares that defendant's prices are below the minimum established "pursuant to contracts entered into between Schering Corporation and retailers in the State of Pennsylvania. Attached hereto is * * * a copy of a currently existing Fair Trade Agreement between Schering Corporation and a Pennsylvania retailer". The agreement is not included in the Exhibit.

I deem the record technically incomplete because there is no fair trade contract in evidence. In these circumstances I will not now enter a preliminary injunction although I would have done so if an appropriate contract had been received in evidence. But I will permit the plaintiff, on notice to the defendant, to establish the actual existence of a fair trade contract, and if such a showing is made, or agreed upon, I will enter an appropriate decree.

The statements of facts and of law in the foregoing Opinion shall be deemed to be Findings of Fact and Conclusions of Law. In addition I affirm plaintiff's Requests for Findings of Facts Nos. 1–15, inclusive, and plaintiff's Requests for Conclusions of Law Nos. 1–5, inclusive.

## ORDER

AND NOW, December 28, 1962, leave is granted plaintiff, on notice to defendant, to establish either by proof or stipulation the actual existence of a fair

9. See generally: Parke, Davis & Co. v. Green Willow, Inc., 205 F.Supp. 346 (S.D. N.Y.1962); Parke, Davis & Co. v. Amalgamated Health & Drug Plan, Inc., 205 F.Supp. 597 (S.D.N.Y.1962); Johnson & Johnson v. Wagonfeld, 206 F.Supp. 30 (S.D.N.Y.1960); Upjohn Co. v. Liberty Drug Co., Inc., 193 F.Supp. 701 (S.D.N.Y. 1959); Parke, Davis & Co. v. Jarvis Drug Co., Inc., 208 F.Supp. 350 (S.D.N.Y. 1962).

trade contract. If within 30 days from this date such contract is established a preliminary injunction will issue; otherwise the motion for preliminary injunction will be denied.