Mead Johnson & Company v. Breggar, Appellant.

Argued January 8, 1963. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused April 26, 1963.

*Wilbur Greenberg,* with him *A. Martin Herring,* and *Miller, Pincus & Greenberg,* for appellant.

*Francis Hopkinson,* with him *Wallace P. Cooney,* and *Drinker, Biddle & Reath,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, March 28, 1963:

Mead Johnson & Company, the plaintiff in this case, is an Indiana corporation engaged in the manufacture and sale of "dextri-maltose," "poly-visol," "lactum," "metrecal" and other pharmaceutical products. On January 17, 1955, it entered into a contract with the Bellview Pharmacy in Philadelphia, whereby the latter bound itself not to sell any Mead Johnson products at prices less those designated by the manufacturer-vendor in a certain schedule of prices which was made part of the contract.

Herbert Breggar and Irving Breggar, individually and trading as Lakoff & Co. (hereinafter referred to as Lakoff), dealt in the same type of products sold by the Bellview Pharmacy, but did not bind itself to Mead Johnson to sell at certain prices as had the Bellview Pharmacy.

Mead Johnson, claiming under the provisions of the Pennsylvania Fair Trade Act (June 5, 1935, P. L. 266, 73 P.S. §8), that Lakoff, even though a non-signer with Mead Johnson, was required to observe the minimum price list laid down by Mead Johnson in Philadelphia, engaged the nationally known Pinkerton Detective Agency, to ascertain the prices being charged by Lakoff in selling Mead Johnson products.

On August 8, 1960, one of the Pinkerton operatives, a Miss Anna K. Johnson, swore to the following statement: "On August 3, 1960, at 12:05 p.m. (D.S.T.) I entered the above mentioned store [Lakoff] and I purchased 12—8 oz. cans of Metrecal (butterscotch) for

$14.00 ($1.16 2/3 per can) including sales tax, although Mead Johnson & Company's fair trade price for said item, as set forth in its then current fair trade price list was $1.59 per can."

Mead Johnson protested that this "underselling" violated Section 2 of the Fair Trade Act, which section reads as follows: "Wilfully and knowingly advertising, offering for sale, or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of section one of this act, whether the person so advertising, offering for sale, or selling is, or is not, a party to such contract, is unfair competition and is actionable at the suit of such vendor, buyer or purchaser of such commodity . . ."

It accordingly filed a complaint in equity in the Court of Common Pleas No. 7 of Philadelphia County, seeking an injunction to restrain Lakoff from advertising, offering for sale or selling at retail any Mead Johnson products at prices less than the minimum retail prices declared in the Mead Johnson January 17, 1955 Fair Trade Agreement with the Bellview Pharmacy.

Lakoff did not contest the equity action. On September 22, 1960, it entered into a stipulation wherein it specifically stated that "without adjudication of any issues of fact or law herein and without admission by any party of any such issue," it agreed to have the court enter a decree enjoining it from selling any Mead Johnson products at less than the stipulated minimum retail resale prices established by the plaintiff, pursuant to agreements with retailers of plaintiff's products in Pennsylvania. The court entered such a decree, repeating that there was no "adjudication of any issues of fact or law herein and without admission by any party of any such issue."

After the filing of the decree, Lakoff made some sales of Mead Johnson products at prices controvert-

ing those referred to in the decree. Mead Johnson, then, on December 5, 1960, petitioned for and received a rule to show cause why an attachment should not issue against Lakoff for contempt of court. Lakoff filed an answer containing new matter in which it alleged that Mead Johnson products were being sold by Lakoff competitors at prices less than the minimum retail prices established by the plaintiff, and moved for dismissal and dissolution of the injunction. Its petition and the rule issued thereon were discharged.

On March 10, 1961, the plaintiff's rule for attachment for contempt was made absolute and the court ordered Lakoff to pay a fine of $50, together with all costs of the proceedings. The court later adjudged Lakoff to be in further contempt for two additional willful violations of its decree and assessed a fine of $100. On October 6, 1961, Lakoff filed exceptions to this supplemental finding of contempt, which exceptions were dismissed eight months later. The court at that time also ordered that "unless defendants purge themselves of contempt by complying with the order of the court within 30 days, an additional fine of $250 is hereby imposed."

Lakoff appealed to this Court from the lower court's refusal of its exceptions to the various orders of contempt.

As already stated, the defendant at no time had entered into any contract with Mead Johnson. May it be compelled to obey conditions embodied in a contract which Mead Johnson made with an entirely different party, namely, the Bellview Pharmacy? Section 1 of the Fair Trade Act says very clearly that price-fixing arrangements are protected only if the commodities involved are "in fair and open competition with commodities of the same general class produced by others." That section reads: "No contract relating to the sale or resale of a commodity which bears, or the label or

content of which bears, or the vending equipment from which said commodity is sold to the consumer bears the trade-mark, brand or the name of the producer or owner of such commodity, *and which is in fair and open competition with commodities of the same general class produced by others*, should be deemed in violation of any law of the State of Pennsylvania by reason of any of the following provisions which may be contained in such contract: (a) That the buyer will not resell such commodity, except at the price stipulated by the vendor. (b) That the buyer of such commodity require upon his resale of such commodity that the purchaser from him agree that such purchaser will not in turn resell except at the price stipulated by the vendor of the buyer." (Emphasis supplied)

In order to bring its agreement on minimum prices within this section, the plaintiff pleaded that "said 'Mead Johnson commodities' are sold in fair and open competition in the Commonwealth of Pennsylvania with products of the same general class produced or manufactured by others."

This averment, however, was never put to proof because Lakoff entered into a stipulation on the subject, as herein already stated.

A producer or owner of any given commodity may not enforce fair trade contracts until and unless it proves that its products, which are the subject of contract, are in fair and open competition within the State. In *Gulf Oil Corp. v. Mays,* 401 Pa. 413, the plaintiff Gulf Oil Corporation filed a complaint against a nonsigner for failing to respect the minimum prices established by Gulf agreements with other dealers, alleging that its gasoline "is in fair and open competition throughout Pennsylvania with gasolines of the same general class produced by others." There was an admission of this allegation in the defendant's answer. Nevertheless this Court, speaking through Mr. Justice

COHEN, said: "Even though the admission here is made in an adversary proceeding, still the state's interest in seeing that unlawful price fixing is not indulged in is of such importance that the mere admission by the adversary is not sufficient to provide the essential prerequisites necessary to invoke the statutory rights and exemptions provided by the Act."

If an admission of "fair and open competition" in the pleadings of a litigated case cannot take the place of proof that the plaintiff's products are in actual fact in fair and open competition, certainly a stipulation between parties which categorically excludes any adjudication of that issue cannot take the place of proof and cannot be made the basis of a court's decree which echoes that the decree was made "without any adjudication, etc."

Price fixing is at its best a drastic curtailment of competitive free enterprise, one of the main pillars of support of the entire American economic structure. At its worst, it can become a strait jacket on initiative in business, resulting in monopoly manacling progress so as to serve a possible conspiratorial status quo.

In *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 309-10, the Supreme Court of the United States said: "It has been held too often to require elaboration now that price fixing is contrary to the policy of competition underlying the Sherman Act and that its illegality does not depend on a showing of its unreasonableness, since it is conclusively presumed to be unreasonable. It makes no difference whether the motives of the participants are good or evil; whether the price fixing is accomplished by express contract or by some more subtle means; whether the participants possess market control; whether the amount of interstate commerce affected is large or small; or whether the effect of the agreement is to raise or decrease prices."

The very idea that a commercial entity may hold in one fettering price-fixing grasp all business men engaged in vending a certain product, just as a herdsman holds lassoed cattle on the plains, offends against the most elementary concept of a free and independent society. The Fair Trade Act is not only in derogation of the common law, it is in defiance of principles which the Federal government has on countless occasions enunciated in its anti-trust legislation and litigation. Hence, the Fair Trade Act must be construed strictly.

Applying that kind of interpretation to the situation in the case at bar, we fail to see wherein the plaintiff has the right to impose on the defendant any restriction without first establishing, in accordance with Section 1 of the Act, that its products are in fair and open competition. In *Gillette Co. v. Master,* 408 Pa. 202, 212, this Court said: "Before a court can entertain an action for a preliminary injunction under section 2 of the Act of 1935 (73 P.S. §8), it must be established that the plaintiff-producer's products are in fair and open competition within the state. Parties cannot by agreement eliminate this requirement and confer power upon the court to enter an injunction despite lack of compliance with the statutory provision. It is fundamental that parties to a divorce action cannot waive the requirement that the libellant prove the residence necessary to establish the court's jurisdiction; nor can they by stipulation agree that the residence necessary to establish jurisdiction is complied with. Indeed it is never within the power of litigants to invest a court with any power not conferred upon it by law . . . Here, as in the requirement of residence in divorce actions, because of the overriding public interest in price fixing litigation, the courts will not enforce fair trade provisions against non-signers unless all the statutory requirements are satisfied . . . This is true notwithstanding the willingness

of the parties to waive strict compliance with the legislative mandate."

The court below sought to distinguish the *Gillette* case just cited from the instant one by arguing that Lakoff did not file an answer denying the plaintiff's complaint wherein it alleged that its products were in open and fair competition, whereas in the *Gillette* case the defendants had originally asserted that they were without sufficient information to affirm or deny the allegations and demanded proof, and then later stipulated that a preliminary injunction should issue. The distinction is not established. Whether the defendant originally denied the plaintiff's averments and then entered into a stipulation to have the decree entered or whether a stipulation was entered into without first attacking the allegation, the net result is always the same, namely, there was no proof in the case that the plaintiff had complied with the iron-clad provision of Section 1 that the commodities in controversy are "in fair and open competition with commodities of the same general class produced by others."

No two parties can agree to suspend the operation of a statute which is enacted for the well being of the people. As was said in *Gulf Oil Corp. v. Mays,* supra, "Legitimization of such contracts . . . is completely dependent upon strict compliance with the Pennsylvania Fair Trade Act . . ."

It is, therefore, clear that if the plaintiff seeks the enforcement of statutory rights, it must prove that the commodities it seeks to protect relate to products which are in open competition, the only fair trade agreement protected by the Act. The entry of a decree in plaintiff's favor, based only on a defendant's consent, without there being any adjudication of the facts or law concerning an indispensable feature of the case, could become a procedure fraught with danger, and even make the court an unwilling instrument of fraud upon the public.

 417

The fact that in other litigation before this Court Mead Johnson has been able to meet the burden of proving its products are in open and fair competition cannot be controlling here. On this appeal, we are bound by the record in the case and it fails to show compliance with the statute. The decree entered in the court below therefore has no legal foundation upon which to rest, and thus cannot be made the basis of contempt charges against the defendant.

The consent decree and the orders of contempt based thereon are reversed and the record remanded for further proceedings consistent with this opinion. Each party to bear own costs.

Mr. Chief Justice BELL, Mr. Justice BENJAMIN R. JONES and Mr. Justice EAGEN dissent.