## The Gillette Co. v. White Cross Discount Centers

760

*Kirkpatrick, Pomeroy, Lockhart & Johnson*, for plaintiff.

*McArdle, Harrington & McLaughlin*, for defendants.

SMITH, J., September 19, 1962.—This case is presently before the court on the application of the Gillette Company, a Delaware corporation, for a preliminary injunction restraining defendants from advertising, offering for sale or selling its products at less than their established trade price.

A preliminary injunction will only issue where the court is satisfied that:

"(1) the rights of the plaintiff are clear; (2) there is an urgent necessity to avoid injury which cannot be compensated for by damages; and (3) greater injury will be done by refusing it than in granting it": Gillette Company v. Master, 408 Pa. 202, 213 (1962).

Plaintiff corporation is divided into two operating divisions: the safety razor division and the Toni division. In addition, plaintiff is the sole owner of the Paper Mate Corporation. Both of plaintiff's divisions produce or manufacture products which are sold at retail throughout the Commonwealth of Pennsylvania.

Defendants are three Pennsylvania corporations, known as White Cross Stores, Inc., numbers 6, 7 and 8, which are respectively located on Liberty Avenue, Pittsburgh, Forbes Avenue, Pittsburgh, and Fifth Avenue, McKeesport, Pennsylvania. Defendants, along with other corporations, are doing business under the fictitious name of "White Cross Discount Centers, Inc." This fictitious name has not been registered in this Commonwealth in conformity with the Act of July 11, 1957, P. L. 783, sec. 5, 54 PS §82.

Another entity that is interwoven throughout the cloth of this suit, although not a direct party to the case, is A. Robinson and Sons, Inc., a corporation in the wholesale distributing business. It is the major source of supply for defendant corporations. There is an exact identity of officers, directors and shareholders between Robinson, defendants and other corporations doing business under the name "White Cross Discount Centers, Inc."

I

*Plaintiff's Case*

In an action in equity to enforce, by way of a preliminary injunction, a fair trade agreement, plaintiff has the burden of proving by clear and precise evidence:

(a) That it has entered into a contract whereby the buyer of its commodities within the Commonwealth of Pennsylvania will not advertise, offer for sale or sell its commodities below the prices stipulated by plaintiff; and

. (b) That its commodities, or the label or contents thereof, bear its name, trademark or brand; and

(c) That its commodities are in fair and open competition [1] with the commodities of the same general class produced by others; and

(d) That the defendants wilfully and knowingly advertised, offered for sale and/or sold plaintiff's commodities at less than the prices stipulated by the plaintiff.

The court will discuss plaintiff's case in the order just enumerated.

*(1) The Contract:*

Both of plaintiff's operating divisions, i.e., the safety razor and Toni divisions, have entered into fair trade agreements with respect to the establishment of fair trade prices for their respective products. However, it has been stipulated by plaintiff that it does not enforce by legal proceedings the products manufactured by the safety razor division.[2]

Plaintiff has entered into a contract with William Contes, owner of Contes Drug Store, by the terms of which Contes, a Pennsylvania retailer, agreed with plaintiff that he would not advertise, offer for sale or

---

[1] Also considered to be free and open competition under the Miller-Tydings amendment to the Sherman Act, 50 Stat. 693, 15 U.S.C.A. §1, and under the McGuire amendment to the Federal Trade Commission Act, 66 Stat. 632, 15 U.S.C.A. §45.

[2] Gillette Foamy Shaving Cream, Gillette Right Guard Deodorant, Thin Gillette Blades, Gillette Blue Blades, Gillette Super Blue Blades, Gillette Brushless Shaving Cream, Gillette Razor and Razor Blade combinations. Included in this list are all types of Gillette razors and various packaged quantities of Gillette razor blades.

sell the commodities of the plaintiff at a price below that stipulated by plaintiff. Plaintiff's witnesses testified that there were other contracts but plaintiff relied upon the Contes agreement.

None of the defendants have entered into fair trade agreements with plaintiff.

An action such as the instant one sounds in tort.[3] It is in the nature of an action for the interference with contractual relationships and applies equally as well to nonsigners as it does to signers.[4] It is the opinion of the court that the contract entered into between Contes and plaintiff is a contract within the contemplation of the Pennsylvania Fair Trade Act[5] and as such is sufficient to bind the defendants.

## (2) Name, Trade Mark or Brand:

Before plaintiff can recover, it must prove that all of the commodities which it is seeking to have fair traded bear (or the label or contents of which bear) plaintiff's name, trade mark or brand. In this case, plaintiff has amply shown, and the court so finds, that all of the commodities of its safety razor division bear its name, trade mark and brand. Defendants did not dispute this point.

## (3) Fair and Open Competition:

The Pennsylvania Fair Trade Act[6] requires that the commodities which plaintiff seeks to fair trade be in fair and open competition with commodities of the same general class produced by others. Neither the act nor the judicial utterances of the courts of this Commonwealth have defined the terms "fair and open

---

[3] See Gillette Company v. Master, 408 Pa. 202 (1962).

[4] Act of June 5, 1935, P. L. 266, sec. 2, as amended, 73 PS §8.

[5] Act of June 5, 1935, P. L. 266, secs. 1-5, as amended, 73 PS §§7-11.

[6] See statute cited footnote 5, supra.

competition" with any degree of certainty. Nor have they stated the necessary elements to be proved in order that a plaintiff can establish its burden of proving it.

In Sinclair Refining Company v. Schwartz, 398 Pa. 60 (1959), the Supreme Court of Pennsylvania held that the mere statement of one of plaintiff's witnesses to the effect that plaintiff was in competition with the major companies in the market was insufficient to meet plaintiff's burden under the act.

In Gulf Oil Corporation v. Mays, 401 Pa. 413 (1960), the Supreme Court refused to accept as binding upon the court the admission in defendants' answer to the effect that plaintiff was in fair and open competition.

There the court stated that the public has a sufficient interest in this type of proceeding to require plaintiff to establish by proper evidence that it is, in fact, in "fair and open competition." In the Mays case, the Supreme Court sustained the refusal to grant a preliminary injunction. This principle was again reiterated in the case of Gillette Company v. Masters, 408 Pa. 202 (1962), when the court stated at page 212:

"Before a court can entertain an action for a preliminary injunction under section 2 of the Act of 1935 (73 PS §8), it must be established that the plaintiff-producer's products are in fair and open competition within the state . . ."

In the case of Mead Johnson & Company v. Martin Wholesale Distributors, Inc., 408 Pa. 12 (1962), the Supreme Court stated at page 18:

"The defendant argues further that the plaintiff did not establish that it was engaged in fair and open competition, as required by the Act. Such affirmative proof was not lacking. The plaintiff's Philadelphia sales manager testified in detail regarding the many products which were in competition with Mead Johnson products. The fact that the plaintiff's prices were in the

same price range as those of its competitors did not constitute proof that the plaintiff was not engaging in free and open competition, or that there was any intimation of 'price fixing.' "

In the instant case, the court is satisfied that plaintiff's commodities in the nature of "shaving creams" and "deodorants" are in fair and open competition with commodities of the same general class produced by others. The record amply sustains this conclusion. Therefore, the court need only consider the balance of plaintiff's commodities in the nature of "razors" and "blades".

Are plaintiff's razors and razor blades in fair and open competition with similar commodities produced by others?

Plaintiff's razors and blades are sold in many stores, including the defendants', throughout the Commonwealth of Pennsylvania. These commodities find their way into the retail market by one of two different methods. The retailer either buys directly from plaintiff or from a wholesaler. In most of the stores a retail consumer would have the opportunity to purchase razors and blades produced by plaintiff's two main competitors, the Shick Safety Razor Company Division of Eversharp, Inc., and the American Safety Razor Company.

In the razor blade field, plaintiff manufactures three types of blades; the Super Blue Blade, the Blue Blade, and the Thin Blade. *All three types are double edge blades.* In the field of razors, plaintiff manufactures five types; the Aristocrat Adjustable Razor, the Super Speed Razor, Slim Adjustable Razors, the Tech Razor and the Valet Autostrap Razor. All five of the razors are made so as to accommodate the double edge razor blade.

The Shick Safety Razor Company predominantly manufactures a single edge blade which is sold in an

injector container. The razor it manufactures is designed so as to accommodate the single edge injector blade.

The American Safety Razor Company predominantly manufactures a single edge blade and several razors. There was some testimony to the effect that it was going to invade the double edge blade market but this was insufficient on which to base a finding.

Neither Shick's nor American's single edge blades would fit in plaintiff's razors. Conversely, plaintiff's double edge blades would not fit the others' single edge type razor.

Within its particular and peculiar manufacturing and marketing sphere for blades, the plaintiff reigns supreme. Plaintiff admittedly controls more than 95 percent of the market in double edge razor blades. In the razor blade market as a whole (single and double edge blades, etc.) plaintiff manufactures and sells slightly more than 70 percent of the razor blades sold in the wet shaving [7] industry in the United States. Moreover, plaintiff's products, along with those of the other two named manufacturers, comprise 99 percent of the total market.

There are other fringe area companies manufacturing and selling razors and blades but their effect on the market is insignificant, so insignificant, in fact, that plaintiff was unable to identify them.

The predominant position of plaintiff in the razor blade market is highlighted by the fact that there have been few changes in the price structure of its commodities in many years and the fact that the established prices are on a horizontal plane with those of its competitors.

---

[7] This market does not include the electrical or dry shave market. The court requested, but the parties did not produce, statistics to show the relative position of the dry or electric shave market to the wet shave market.

Fair Trade Acts are in derogation of the common law and, therefore, should be strictly construed: Bristol-Myers Co. v. Lit Brothers, Inc., No. 1, 33 D. & C. 52, aff'd 336 Pa. 81 (1939). They are a legislative exception not only to a free economy but to the Federal anti-trust legislation. The declared purpose for their existence is to protect the public from the evils of predatory price cutting and the "loss-leader" practices of sellers as well as protecting the good will and name of the manufacturer. Most certainly, they were not intended to be used as an instrumentality for price fixing. Hence, the requirement that the commodities be in free or fair and open competition.

Prior to the adoption of the Miller-Tydings Amendment to the Sherman Act,[8] the State fair trade acts were not exempted from the applicable Federal legislation. Even after the Miller-Tydings Amendment, the Supreme Court of the United States in the case of Schwegmann Brothers v. Calvert Distillers Corp., 341 U. S. 384 (1951), refused to apply the coverage of the Miller-Tydings amendment to the State Fair Trade Acts when they affected "'non-signors". It was only after Congress passed the McGuire Amendment [9] that a State fair trade act was permitted to apply to a nonsignor where the commodities were in interstate commerce and a proper subject of Federal regulation.

Plaintiff in the instant case is admittedly in "interstate commerce" and must come within the exception as provided by the McGuire Amendment, which amendment has a provision similar to that of the Pennsylvania Fair Trade Act, which provides that:

"Nothing contained in this section or in any of the Antitrust Acts shall render unlawful any contracts or agreements prescribing minimum or stipulated prices

---

[8] 50 Stat. 693, 15 U.S.C.A. §1.

[9] 66 Stat. 631, 15 U.S.C.A. §45.

. . . for the resale of a commodity . . . which is in free and open competition with commodities of the same general class produced or distributed by others . . ."

If plaintiff is to succeed in enforcing its fair trade contracts, it must meet the burden of proving that it is in fair and open competition within the Pennsylvania Fair Trade Act and that it is in free and open competition within the provisions of the McGuire Amendment.

In Eastman Kodak Co. v. Federal Trade Commission, 158 F. 2d 592 (2d Cir. 1946), the Second Circuit Court of Appeals had the occasion to deal with a case which involved the Federal acts and, in commenting thereon, stated:

". . . As clearly appears from the legislative history of the Miller-Tydings amendment, the purpose was to validate resale price agreements with respect to branded commodities which are in *effective* competition with similar commodities produced by others so that if the resale of the branded article were set too high the manufacturer would lose his trade by the competition of other similar articles. Hence it will not do to say that all film is in the same class. If a purchaser wants a color film he must be able to buy it from more than one manufacturer if there is to be 'free and open competition with commodities of the same general class'; that he can buy a black and white film will not serve to destroy the monopoly of the sole producer of color film . . .": 158 F. 2d at 594. (Italics supplied.)

In its opinion, the circuit court stated "that the competition must be effective."

Our Supreme Court has stated, in the Gulf Oil and Mays cases, that the public has an interest in the determination of fair trade cases. To this extent, the Supreme Court has mandated that the chancellor be satis-

fied that the persons seeking a preliminary injunction affirmatively show that their commodities are in fair and open competition with similar commodities produced by others. Nowhere has the court been able to find, nor has any authority been cited which would define or outline what "fair and open competition", under the State act, or "free and open competition", under the Federal act, means but it becomes obvious from a reading of the history of Federal legislation respecting monopolies, trusts and State fair trade acts that the commodities must be in competition so that the person who is seeking to fair trade his items cannot, because of a lack of effective competition, injure the public by controlling the price of his commodities without having them meet the test of a free and open market.[10]

If this were not true, then the act, instead of being an aid to the public and a protection for the manufacturer of its good will, trademark and trade name, in reality would be an effective instrumentally to set and control prices without any consideration for the consuming public.

In this respect, the court feels that plaintiff has failed to meet that burden which the law requires with regard to its double edged razor blades. In this instance, plaintiff's double edged razor blades represent slightly more than 95 percent of the market. Even if plaintiff's products, as manufactured by its safety razor division, were to be considered in competition with all other products in the wet shaving market, they would represent slightly more than 70 percent of the total market.

Either taking the double edged razor blades as a separate item or taking them as part of the products which comprise the wet shaving market, it is the opinion of this court that plaintiff has failed to show there

[10] Sec. 81 Cong. Rec. 7495 (1937) (remarks of Senator Tydings).

is sufficient *effective* competition to conclude that plaintiff's blades are in fair and open competition with other commodties of a similar nature produced by others.

Plaintiff produces only a double edged razor blade and its two largest competitors produce a single edged blade. Of all the blades together, these three possess 99 percent of the market in blades. During the past several years, it has been established that the prices of the three companies for their razor blades, of respective quality and quantity, have remained substantially the same, each continuing in its own sphere to produce its particular type of product and maintain its prices at the same level.

While it is true that the consuming public would have the choice in almost all of the stores in this Commonwealth of purchasing either one of the three largest producers' products, it is also accurate to say that there is no effective competition in this regard because of the large percentage of the market which is allocated to plaintiff's razor product. The mere presence in the market of a competitor's commodity is not sufficient to meet the burden of the Fair Trade Act. The commodities must be in "fair and open competition" with a similar class of products produced by the competitor. In fact, it would appear that plaintiff is constantly increasing its predominant influence in the razor blade market to the exclusion of other producers.

Competition to be effective and thus free and open should be competition to the extent that there is brought into play the free economic forces of the open market so that they may act upon the various manufacturers for the benefit of the consuming public. There is nothing in the record, as affects the razor blade industry in the United States and in this State particularly, to indicate that the commodities of the three largest manufacturers have been subjected to the economic pressures of the market place.

The pricing policy of plaintiff and the prices of the other two manufacturers have remained rigid. The fact that neither plaintiff nor the other manufacturers have seriously attempted to invade the other's field by the manufacture and sale of the type of blade produced by the other indicates that they are content to retain, as best they can, the respective markets for their particular type of commodity.

The court does not feel that this is sufficient. The interest of the public requires that plaintiff clearly show by convincing evidence that its razor blades are in effective competition and this cannot be done by merely showing that there are other blades of a different nature for sale within the Commonwealth.

As respects plaintiff's razors, there is no evidence in the record to indicate that they are in fair and open competition with similar razors produced by others.

*(4) Wilfully and knowingly advertising, offering for sale or selling at less than the Fair Trade Price:*

The fourth requirement which plaintiff has the burden of proving has been stipulated to by defendants. From the evidence which the court has heard and from the admission of defendants, the court finds that defendants willfully and knowingly advertised, offered for sale and sold the commodities of plaintiff's safety razor division at prices less than the prices stipulated in a fair trade contract.

There remains, therefore, for the court's consideration those commodities which have been classified as "shaving creams" and "deodorants".

II

*Defendants' Case*

In defense of this action, defendants have raised many issues which the court will consider as follows:

*(1) The statutory defense and equitable estoppel:*

Section 2 of the Pennsylvania Fair Trade Act, 73 PS §8, provides as follows:

". . . It shall, however, be a complete defense to such an action for the defendant to prove that the party stipulating such price, after at least seven days written notice by the defendant prior to the commencement of such action, has failed to take reasonable and diligent steps to prevent the continuation of such advertising, offering for sale or selling, by those in competition with the defendant, who were specified in such notice."

There is nothing in the record in this case from which the court can justify a finding that defendants have given the statutory notice to plaintiff that those in competition with defendant were advertising, offering for sale or selling plaintiff's products in violation of its fair trade contract.

There is testimony to the effect that notice was given to plaintiff by a stranger to this action. The court feels this is not sufficient. However, even if this notice complied with the statute, it is clear from the record that plaintiff has observed it and has taken reasonable and diligent steps to prevent the continuation of any violation of its fair trade agreements.

The record amply shows that plaintiff, on receiving notice of violation, sought voluntary compliance, had its salesmen shop to see if the violation was continuing and employed legal counsel to commence action. This the court considers to be reasonable and diligent and would bar the defense of the statute.

Secondly, in this respect, defendants raised the question of equitable estoppel. In this particular, they state they have relied upon plaintiff's failure to properly police and enforce its fair trade agreements. With this, the court cannot agree. There is nothing in the record to show that plaintiff acted in any manner other than reasonably and diligently, and there is nothing in the record from which it could be said that defendants could reasonably rely to their detriment upon any actions of plaintiff.

*(2) Abandonment.*

Defendant further suggests that plaintiff, by various practices and the condonation of other schemes, has abandoned its fair trade program and, therefore, cannot be permitted to enforce it now.

*(a) Indirect Discounts.*

Throughout the United States, in the early 1930's, the practice of giving trading stamps to customers upon the purchase of merchandise became widespread in the retailing industry. The buyer was given a number of trading stamps, usually at a percentage proportionate to the amount of money spent on his purchases. These trading stamps could then be redeemed in varying quantities to obtain commodities of various values.

Initially, this practice was to give a single trading stamp for approximately every ten cents of value of commodities purchased. However, in the past decade, this practice has become antiquated in the light of modern merchandising techniques.

The giving of trading stamps today is as different from that practiced a decade ago as is the jet plane in comparison with our new orbiting capsule.

In 1939, when the issue of trading stamps was first raised before the Supreme Court, the bonus by way of stamps amounted to about 1.75 percent of the purchase price of a given commodity. The same percentage was true in 1956, when the second case was brought before the Supreme Court. However, in recent years, the trading stamp has gone into orbit; the percentage of bonus by way of trading stamps can more commonly be found between 7 and 13 percent, and in some cases as high as 20 percent.

The practice of giving trading stamps has expanded from the original giving of a single trading stamp for every ten cents of purchase (or 1.75 percent of the purchase price) to the quite frequent and extremely com-

mon practice of giving double stamps, triple stamps and even bonus stamps. Some of these are done in combinations. For example, a retailer may give triple stamps on the purchase of commodities and at the same time, if the purchaser produces an advertisement of the retailer, give to the purchaser "bonus stamps", which at times run as high as 50 stamps per dollar.

In this particular community, this practice is widespread and of a common and accepted nature. It is now most certainly an integral part of the merchandising techniques of the major retailers in this community. That products have been advertised for sale by retailers offering these various plans cannot now be doubted.

Among the many products which are sold and for which these various premiums of double, triple and bonus stamps are offered are included the products of plaintiff. Under special premiums offered by the retailers of this community, the consuming public may purchase products of plaintiff and receive a considerable number of trading stamps. For example, in purchasing $25 worth of plaintiff's products, a customer has received a sufficient number of trading stamps so that, upon redemption, he would be entitled to an item which demands a price of nearly $5. This constitutes nearly 20 percent of the amount spent.

In all of the instances in which these special stamp plans are offered, it is to be pointed out that the stamps are offered on an "across-the-board" basis. The special stamps are not given only on the purchase of plaintiff's products but on all merchandise generally sold by the retailers. To this extent, it may be said that the stamp premiums are a special promotional device of the retailers. However, they do have the effect of giving something of value to the retail purchaser which, as previously pointed out, can range from 7 to 13 percent and, perhaps even higher. The percentage of the bonus by way of stamps is not today as it was in

the cases which have been brought before the Supreme Court for its consideration.

The 1.75 percent bonus which was considered de minimis non curat lex by the Supreme Court[11] cannot be compared with the 7 to 13 percent which is presently a common practice in the retail market of this community. The discount by way of trading stamps today is substantive and is a thing of value beyond what the Supreme Court had to consider in the previous cases.

In the case of Bristol-Myers Company, Inc., v. Lit Brothers, Inc., No. 1, 336 Pa. 81 (1939), the Supreme Court was first presented with the issue of whether or not the giving of a single trading stamp for each ten cents of purchase was a violation of the Fair Trade Act. The Supreme Court in that case stated as follows (page 90):

"It is clear to us that the practice indulged in by Lit Brothers, of issuing trading stamps with the sales of its merchandise [at the proportion of 1.76 per cent of the purchase price] falls within the sphere of legitimate competition and does not constitute a 'selling [of] any commodity at less than the price stipulated' and that it is not 'unfair competition' within the meaning of the act appellant invokes. To come within the prohibitions of the act, Lit Brothers would have to either (1) cut *directly* the price of the commodities within the act's protection, or (2) accomplish the same result in respect to the commodities by a device which was a palpable subterfuge resorted to for a purpose of circumventing the law . . . What Lit Brothers did in this matter is neither direct price-cutting of certain commodities nor is it a palpable subterfuge to conceal a law evasion. . . ."

The court went on to say (page 91):

---

[11] Bristol-Myers Co. v. Lit Bros. Inc. No. 1, 336 Pa. 81 (1939).

"There is also a time-honored maxim of the law which applies to this case, to wit: 'De minimis non curat lex'. . . . Where there are irregularities of very slight consequence, it does not intend that the infliction of penalties should be inflexibly severe. If the deviation were a mere trifle, which, if continued in practice, would weigh little or nothing on the public interest, it might properly be overlooked".

Seventeen years after the Lit case, the Supreme Court again considered the question of stamps and affirmed its previous decision in the Lit case. In the case of Gever v. American Stores Co., 387 Pa. 206 (1956), the court stated at page 210:

" . . . But in considering the question whether the Act has been violated by defendants there must be borne in mind that the stamps are given to their customers not only with trade-marked articles but, in pursuance of a general business practice of their establishments, with *all* commodities sold by them, and that this is a practice which has existed throughout the entire country for very many years, long antedating all Fair Trade legislation in the various States. It was these and other considerations which led to the decision of this Court in Bristol-Myers Company v. Lit Brothers, Inc., 336 Pa. 81, 6 A. 2d 843, that the giving of trading stamps did not amount to a violation of the Act . . ."

And at page 211, the court said:

" . . . The Bristol-Myers Company case was decided some 17 years ago and during all that time the Legislature has not seen fit to amend the Act so as to make the issuance of trading stamps with the sale of trade-marked articles a violation of the Act, which is particularly significant in view of the fact that the Legislature *has* several times amended the Act in other particulars, one such amendment being as recent as the Act of May 25, 1956, No. 589. It is thereby clear

that the Legislature never intended to outlaw such a *normal and long-established practice of general application.......*" (Italics supplied.)

In the instant case, defendants are admittedly in the business of operating discount houses in this county. They offer for the consuming public approximately 2,000 items, all of which are discounted at between 20 to 27 percent of their normal retail price. At the time of the trial, plaintiff's products were being discounted from the fair trade prices at approximately 27 percent, as were many other commodities sold by defendants.

Defendants did not employ the age old custom of using plaintiff's product as a "loss leader", nor did they engage in the custom of a single predatory price cut on plaintiff's product. While the difference may not initially seem significant, defendant discounted all the products it sold. In effect, what it was doing was advertising to the public that it could purchase the commodities offered for sale at a substantial savings through the use of direct discounts. They do not engage in the giving of trading stamps, which were redeemable for other merchandise, or towards the purchase of other commodities, such as is the practice of some of the retailers in this community.

The court now has presented for its consideration the question of whether or not the practice of issuing double, triple, bonus and other different stamps and premiums to the retail consumer is a violation of the Fair Trade Act.

In this particular, plaintiff offered testimony through its employes to the effect it did not consider the giving of stamps as violative of the Fair Trade Act in this Commonwealth. The general sales manager of plaintiff testified that he was advised by their counsel that they relied upon the Lit and American Stores Company cases and they felt they could not object to this new merchandising technique.

To this extent, the court feels that there is merit in plaintiff's contention. It certainly should not be penalized in a court of equity for relying upon the judicial pronouncements of our Supreme Court. This court will not do so.

However, it is to be pointed out that the facts of the Lit case and the Gever case are extremely different from and most certainly distinguishable from the facts in the instant case. Discounting can be achieved by more than one method:

First, there is the most obvious method, and that employed by defendants, in giving a direct cash discount or price reduction at the time the goods are purchased.

The second method, and the one which is becoming more commonly used in this community, is that of giving trading stamps or other premiums whereby the purchaser receives, in return for his purchase, not a direct reduction in price but rather a stamp or premium having value to the extent that it may be redeemed in other merchandise. This latter method no longer represents the de minimis amount of 1.75 percent, but rather amounts ranging from 7 to 13 percent and, in some cases, slightly higher. The fact that it is an across the board merchandising technique (with the exception of milk) does not lessen the effect of the plan in the eyes of the consuming public.

What many of the large retail outlets are doing is discounting by stamps and premiums rather than discounting by direct price reduction. By using one technique or the other, by giving it one name or the other, the results are the same. That is, the consuming public is purchasing the goods at a lesser amount either because: (1) It is receiving a direct monetary reduction; or (2) it is receiving something which has a substantial value in return for its purchases.

If the giving of trading stamps having bonus values from 7 to 13 percent were not considered violative of fair trade practices, then even if this court were to issue an injunction restraining defendants from giving a direct reduced price to the consuming public, they could achieve the same results, as do other retailers, by the issuance of trading stamps in the same proportion as their cash discounts now represent to the recommended fair trade price.

If such were the law, then defendants could sell the commodities of plaintiff, along with its other commodities, at the fair trade prices and then offer trading stamps which would have the same value as its previous cash discount. The results would be the same. Equity looks to the substance rather than to the form. It should look to the practical results which will be achieved by its action and by the conduct of and the result to the parties.

If defendants were to employ the latter technique, it could hardly be said to be subterfuge because all of the items are discounted rather than a select few or only plaintiff's.

Some mention should be made here of the so-called "Instant-Dividend Plan." This plan has been advertised and used for the purpose of financing the purchase of household appliances by customers of retailers.

The procedure is for the buyer to select an appliance, enter into a sales and financing agreement and, over the period of time stipulated, to present his monthly cash register receipts to the retailer who will, in turn, credit approximately five and one-half percent of the amount purchased to the customer's financing obligation. All of this transpires on the retailer's premises.

This plan has been widely advertised. The advertisements also clearly indicate that the plan does not replace the trading stamp policy of the retailer but, rather, is in addition to it.

The retailers promoting this plan sell plaintiff's products. No attempt is made by these retailers to exclude plaintiff's products from the operation of these programs.

This scheme, when compounded with even a minimum trading stamp program, acts to give to the purchaser a great deal of value and must, in the final analysis, operate as a savings to him. The condonation of these programs by plaintiff, knowing as it must that its products are involved, amounts to an abandonment of its fair trade program.

However, since the court feels that it would be equitably unfair to prejudice or penalize plaintiff because of its reliance upon the Lit and American Store cases, it will issue an injunction affecting the shaving creams and deodorants, preliminary in nature and for a period of 90 days, so that plaintiff may attempt enforcement of its fair trade agreements in the light of this opinion.

*(b) Combination Sales:*

At approximately four times during the year, plaintiff offers to the consuming public "combination sales" on its fair trade products manufactured by its safety razor division. On two of these occasions, plaintiff will combine one of its fair trade products with another for Father's Day and at Christmas time. The total price at which these combination sales are offered to the public is the total fair trade price of these items individually. With this, there can be no question that it would be in keeping with the letter and spirit of the Fair Trade Act.

On two other occasions during the year, plaintiff combines two of its fair traded items in one combination package and offers them to the consuming public at a price less than the total fair trade prices of the items individually. For example, in January of this

year, plaintiff combined a can of Gillette Foamy Shaving Cream with a package of its "blue blades." The total fair trade value of these items individually would be $1.98; the combination sales price is $1.50.

These combination sales are offered to the public through its retailers with a special promotional intent in mind and for a specific period of time. While the combination packages are sold to the retail outlets on a quota basis, there is nothing in the record to show that any retailer is unable to obtain a sufficient amount of combination packages to meet his demands. At the end of the stipulated period in which the products are offered for sale, the manufacturer will either take back the products or permit the retailer to break them up into their individual components and sell them at a higher retail price.

It is defendant's contention that, when plaintiff offers these products in a combination package for less than their combined fair trade price (if sold individually), plaintiff is violating the Fair Trade Act. With this contention, the court cannot agree.

It seems reasonable that a combination package can be made and this combination package fair traded with no prejudice either to the retailer or the consuming public. In the case of Gillette Co. v. Two Guys From Harrison, 36 N. J. 342, 177 A. 2d 555 (1962), the Supreme Court of New Jersey had the occasion to deal with a similar case. In that case, they refused to sustain the fair trading of certain items which were offered in combination. However, in so doing, the court stated:

"It may be that a combination could be used without loss of the fair trade price on individual items if the producers employed a program whereby the retailers holding such individual items would plainly be protected against all economic loss with respect to them . . ."

*(c) Zone Pricing:*

The Pennsylvania Fair Trade Act is, as the name implies, an act which extends coverage throughout the Commonwealth of Pennsylvania. There is nothing in the act itself or in the legislative history of this, or other fair trade acts, which would indicate or lead this court to find that the act was not meant to have other than a uniform application throughout the State. A fair trade contract entered into in Scranton would be sufficient to bind a retailer in Pittsburgh.

If plaintiff wants to enforce its fair trade prices and give meaning and effect to its fair trade contracts, it must do so in a uniform manner which will have a State-wide application. It cannot divide the State into sections or districts, no matter how laudable the purpose, and then attempt to apply it in other parts of the State.

In the instant case, plaintiff admittedly has created what it refers to as a market area for the purposes of market analysis in the vicinity of Erie, Pennsylvania. In that area it offers, supposedly for the purpose of determining the consumer reaction to its products, a razor blade for sale through its dealers in that district at a price substantially less than that at which it is offered as a fair traded item in this area. Moreover, as between two retailers carrying the same Gillette product, different fair trade prices were extracted. In addition, plaintiff permitted the marketing of one of its razors in a new quantity package at a price below its "alleged" fair trade price for that commodity. At the same time, the product was available to only one retailer, to the exclusion of others in the immediate vicinity.

This practice, commenced prior to the institution of this suit, was in effect during the early part of the hearing and was only discontinued after considerable testimony regarding this practice had been taken.

Defendants contend that the marketing of the razor and/or blade in the Erie area at less than that for which it was offered as a fair traded item in this and adjoining areas was an abandonment by plaintiffs of its fair trade practice.

No matter how laudable or honorable plaintiff's intention may have been, it is the opinion of this court that they cannot fair trade an item in one portion or part of the State at an amount less than that in the other areas of the State. Not only must the application of the Fair Trade Act be uniform, but the interpretation and enforcement of fair trade contracts must receive the same uniformity throughout the State.

Plaintiff, by its actions in offering for sale through retail outlets in the Erie area its razors and/or blades at a price less than that which it fair traded these commodities in other parts of the State, is guilty of abandoning its fair trade program with respect to these products.

*(d) Other Defenses:*

Defendants, during the course of the trial and in their brief, raised many other issues which the court has considered at great length but feels to be without merit.

### III

### *Conclusion*

For the reasons set forth herein, the court is of the opinion that an injunction should issue preliminarily restraining defendants from advertising or offering for sale the shaving creams and deodorants of plaintiff at less than the stipulated fair trade prices of plaintiff.

The request for a preliminary injunction as respects the razors and blades of plaintiff will be, for the reasons herein set forth, refused.

### *Order of Court*

And now, to wit, September 19, 1962, after hearing and upon consideration of the testimony and briefs

and arguments of counsel, it is hereby ordered, adjudged and decreed that defendants, its officers, servants, agents and employes be and hereby are preliminarily enjoined from advertising, offering for sale or selling any and all of the shaving cream and deodorant products produced by plaintiff at a price below the minimum resale price stipulated by plaintiff pursuant to any valid and subsisting minimum resale price contract under the provisions of the Act of June 5, 1935, P. L. 266, as amended, 73 PS §7 et seq. This injunction is preliminary in nature and is to continue in effect for a period of 90 days or until final hearing in this matter.

It is further ordered, adjudged and decreed that plaintiff's prayer for preliminary injunctive relief with respect to its razors and razor blades is hereby refused.

The parties to bear their own costs.