Commonwealth, Appellant, *v.* Queen Coal Co.

Argued May 25, 1971. Before JONES, EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

*Morris J. Solomon*, Assistant Attorney General, with him *Louis R. Salamon*, and *William M. Gross*, Assistant Attorney Generals, and *J. Shane Creamer*, Attorney General, for Commonwealth, appellant.

*Vincent J. Morocco*, with him *Leonard A. Redlich*, and *Redlich, Cassol, Redlich & Morocco*, for appellee.

OPINION PER CURIAM, December 20, 1971:

The decree is affirmed by an evenly divided Court. Costs on appellees.

Mr. Chief Justice BELL took no part in the consideration or decision of this case.

---

DISSENTING OPINION BY MR. JUSTICE EAGEN:

I dissent.

This is an appeal from the denial of a preliminary injunction by the Commonwealth Court. At the behest of the Secretary of Environmental Resources, the Commonwealth of Pennsylvania, through the office of the Attorney General, filed a suit in equity seeking preliminary relief to enjoin appellees from operating beehive coke ovens,[1] in Mt. Pleasant Township, Westmoreland County, Pennsylvania. The Commonwealth's complaint alleged two violations of the Air Pollution Control Act, Act of January 8, 1960, P. L. (1959) 2119, as amended June 12, 1968, P. L.    , No. 92, 35 P.S. §4001 et seq. (Supp. 1971), and the rules and regulations promulgated thereunder: (1) operation of an air contamination source after modification, without a permit; (2) violation of Regulation IV because the ovens were emitting

---

[1] A beehive coke oven is an arched, dome-shaped oven in which heat is supplied by partial combustion of coal within the oven chambers and in which destructive distillation of coal occurs with no recovery of by-products. The combustion process transforms the coal into the desired coke and the deleterious by-products are discharged directly into the air.

smoke from a combustion unit in excess of the regulatory standard set forth in Regulation IV, which is Ringelmann No. 2. The Commonwealth also alleged that the operation of the ovens created a public nuisance. After studying the record, it is my view that the evidence clearly established that the ovens were emitting smoke in violation of Regulation IV, and this, in itself, required the issuance of the injunction requested.[2]

The salient facts are these. The beehive coke ovens in controversy were put in operation late in 1969, after approximately sixteen years of nonuse. Immediately after the ovens began operating, residents of the area began to suffer great discomfort due to the noxious odor which was discharged from the ovens as a result of the coking process. A resident of the area, one Helen A. Fitch, lodged a complaint with the Department of Health (the predecessor of the Department of Environmental Resources) and an immediate investigation was undertaken.

The inquiry showed that the ovens were in full operation, and the by-products of the coking process were being discharged directly into the air, without any attempt to filter out the noxious pollutants. A letter was dispatched from the Department requesting that appellees take immediate steps to control the air pollution. One of the appellees responded saying an engineer would be contacted, and plans would be submitted to the Commonwealth showing how the problem would be corrected. Five months later, no steps had been taken to correct the problem, nor had a qualified pollution engineer been consulted.

The following testimony was developed at the hearing before the court below by the Commonwealth. Three

---

[2]In view of this conclusion, I find it unnecessary to now reach the question of whether or not the Commonwealth sustained the other allegations of the complaint.

residents of the area testified that as a result of the noxious odors they were caused personal discomfort such as sinus problems, eyes watering, sneezing, and choking, and equated the odor to sewage. They stated further that their homes had become increasingly dirty and had taken on an unpleasant odor. Moreover, one witness stated that she was unable to sleep at night, and another complaining party said she was unable to sit outdoors during the summer months.

Additionally, the Commonwealth brought forth three expert witnesses who testified as follows. Mr. Venkataraman Ramadass, the regional air pollution control engineer, stated that beehive coke ovens, of the nature of those in controversy, discharged the following volatile matter and gases directly into the atmosphere: ammonia, tar, oils, carbon monoxide, carbon dioxide, hydrogen sulfide, sulpher dioxide and hydrogen cyanide. Furthermore, he stated that in the course of one month 1600 tons of coal is charged into the ovens, and 1200 tons of coke is produced, with approximately *400 tons of by-products,* of the aforementioned nature, discharged directly into the air without any filtering whatsoever.

Mr. Larry W. Wonders, an air pollution control engineer, testified that on December 1, 1970, he tested the density of the smoke from four different ovens with a scientific device known as a smokescope and determined that all the emissions were in excess of the standards set out in Regulation IV, with three of the ovens emitting smoke which was 60 percent black and one oven discharging smoke which was 40 percent black.

Mr. Orval Wold, an air pollution control technician, also testified that on three different days between December 15, 1970, and March 16, 1971, he tested eleven ovens and all readings were in excess of the regulatory standard, with the majority of readings showing 60

percent black, with some readings as high as 80 to 90 percent black.

Cumulatively, looking at the test results, we see that over a period of four months, on four different days, fifteen ovens were tested for a total of 251 minutes (approximately 4 hours and 11 minutes) and all tests established the discharge of smoke was in excess of Ringelmann No. 2, the standard set by the Legislature to show at what point the smoke becomes detrimental to health, and all of this evidence went uncontradicted by appellees.

I realize that since this appeal is from a decree refusing a preliminary injunction that our scope of review is limited. See *Pennsylvania Public Utility Commission v. Allegheny County Port Authority,* 433 Pa. 495, 252 A. 2d 367 (1969). However, where the uncontradicted evidence establishes a blatant violation of the law, such as here, and that violation is resulting in injury to health, and damage to property, I believe the lower court erred in not immediately enjoining the violation.

Initially, in disposing of Count II of the Commonwealth's complaint the court ruled that Regulation IV is not prohibitory in nature. Regulation IV in pertinent part reads as follows:

To Control Local Air Pollution From Sources of Particulate or Gaseous Matter Emissions

"Section 1.3 Limits for Particulate Matter Emissions

"In the absence of a determination by the Commission imposing more stringent or less stringent limits, as provided for in Section 1.4 of this regulation, a local air pollution problem shall be deemed to exist: (1) If any person causes, suffers, allows or permits smoke from any combustion unit, the shade or appearance of

which is darker than No. 2 of the Ringelmann Smoke Chart, to be emitted into the outdoor atmosphere." Regulation IV of the Air Pollution Commission, Adopted March 15, 1966, amended December 19, 1969. Although this section of Regulation IV is not written in prohibitory terms, I am of the opinion that the lower court fell into error by limiting its consideration to just this section of the entire statutory scheme. To properly ascertain the purpose of a set of regulations promulgated under a valid statute, it is imperative that a reviewing party return to the body of the statute itself to determine the purpose of the regulation in light of the goal of the statute. A review of the declaration of policy of the statute in question, Act of 1960, supra, 35 P.S. §4002 (Supp. 1971), indicates to this writer that the obvious end result which the Legislature intended was the prohibition of air pollution. This seems to me the only logical conclusion that can be reached because the Legislature chose to employ phrases such as *"protect the air resources of the Commonwealth"*, *"protection* of public health, safety and well-being", *"prevention* of injury to plant and animal life and to property", and *"protection* of the comfort and convenience of the public." (Emphasis supplied.) The only reasonable means through which these goals may be achieved is to prohibit the activity that causes the undesired results.

Furthermore, in delegating powers to the Air Pollution Commission (these powers are now exercised by the Department of Environmental Resources and two Environmental Boards) the Legislature stated:

## THE AIR POLLUTION COMMISSION

"(d) The Commission shall have the power and its duty shall be to—

.   .   .

"(2) Adopt rules and regulations for the control of air pollution.

. . .

"(6) Establish and publish maximum quantities of air contaminants that may be permitted under various conditions at the point of use from any air contaminant source in various areas of the Commonwealth so as to control air pollution." Act of 1960, supra, 35 P.S. §4005(d), (2) and (6) (Supp. 1971). The language employed by the Legislature in this section leads me to conclude that although the regulations were to be definitional in character, by their purpose, i.e., set standards to carry forward the prohibitory goal of the statute, they had to be prohibitory in nature.[3]

Moreover, a review of the text of the statute convinces me that the Legislature intended these regulations to be prohibitory:

### UNLAWFUL CONDUCT

"It shall be unlawful to fail to comply with any rule or regulation or to fail to comply with any order of the department, to violate or to assist in the violation of any of the provisions of this act or rules and regulations adopted hereunder. . . ."

---

[3] It is interesting to note that in adopting Regulation IV, the Air Pollution Commission used the following language in the INTRODUCTION: "It is the purpose of this regulation to provide for control and prevention of local air pollution anywhere in the Commonwealth. . . ." Also in the *Guides For Compliance with Regulation IV* (adopted March 15, 1966, amended December 19, 1969), the Air Pollution Commission in the INTRODUCTION to said *Guides* stated in pertinent part:

"Regulation IV has two main purposes:

"A. To permit the Commission to bring about control of single or multiple air contamination sources which are creating specific local air pollution problems."

Act of 1960, supra, 35 P.S. §4008 (Supp. 1971). It is beyond the comprehension of this writer how a person can "violate" a regulation if that regulation does not prohibit certain conduct. Hence, on the basis of this reasoning, I feel that the rule of law applied by the lower court was clearly wrong.

Secondly, I take issue with the lower court's alternative finding that the Department must first issue an order before it can institute equitable proceedings. The court came to this conclusion because of the following language in Regulation IV, Section 1.3: "Whenever a local air pollution problem is deemed to exist, the Department may in accordance with the procedures provided in the Air Pollution Control Act, issue an order directing the person or persons charged with causing, suffering, allowing or permitting such air pollution problem to control, abate or prevent such air pollution problem." Regulation IV, supra. To reach its decision the court below had to read the word m-a-y as m-u-s-t. This reading overlooks the three methods made available to the Department to enforce the provisions of the statute: (1) administrative, Act of 1960, supra, 35 P.S. §4004(4.1) (Supp. 1971); (2) equitable, Act of 1960, supra, 35 P.S. §4010(a) (Supp. 1971); and (3) penalties in the form of monetary fines, Act of 1960, supra, 35 P.S. §4009 (Supp. 1971). It appears to me that the Legislature intended the Department to have three separate and distinct avenues of enforcement available, rather than a combination of an administrative order and either an injunction or penalties. I believe that this interpretation is justified by examining Section 4010(a) of the statute, Act of 1960, supra, 35 P.S. §4010(a) (Supp. 1971), which provides for injunctive relief. This section uses the phrase "for an injunction to restrain all violations of this act." If the Legislature intended the Department to first obtain an order, Sec-

tion 4010 (a) would read—for an injunction for a violation of an order. Moreover, reviewing Sections 4008 and 4009 together, Act of 1960, supra, 35 P.S. §§4008, 4009 (Supp. 1971), shows no indication that the Department has to secure an order before it can seek monetary penalties.

Lastly, looking at Section 4010(b) which reads:

APPLICATION FOR INJUNCTIVE RELIEF

"(b) The penalties and remedies prescribed by this act shall be deemed concurrent and *the existence of* or exercise of *any remedy shall not prevent the department from exercising any other remedy hereunder, at law or in equity.*" (Act of 1960, supra, 35 P.S. §4010(b) (Supp. 1971). (Emphasis supplied.) We there see that the remedies can be concurrently exercised, and the existence of one remedy does not preclude the Department from employing any other remedy. Thus, I believe the lower court committed error on this point.

In light of this, turning to the substantive issue, the question evolves to this: Does the Commonwealth have a right to a preliminary decree, when it establishes a *clear and continuing* violation of a regulation promulgated under the Air Pollution Control Act? My answer is "Yes".

In reaching my conclusion, I place primary reliance on *Pennsylvania Public Utility Commission v. Israel*, 356 Pa. 400, 52 A. 2d 317 (1947), and the cases following the doctrine therein set forth.[4] The *Israel* doctrine is concisely set out in the following excerpts from the opinion: "When the Legislature declares certain con-

---

[4] See *Mead Johnson & Co. v. Martin Wholesale Dist., Inc.*, 408 Pa. 12, 182 A. 2d 741 (1962); *Commonwealth ex rel. Chidsey v. Black*, 363 Pa. 231, 69 A. 2d 376 (1949); *Commonwealth v. Gibney*, 21 Pa. D. & C. 2d 5 (1959).

duct to be unlawful it is tantamount in law to calling it injurious to the public. For one to continue such unlawful conduct constitutes irreparable injury.

. . .

"When the provisions of the Public Utility Commission Law are being violated the Legislature provided for the Commission to come before this Court, and prevent the violation by obtaining an injunction. When the right to such injunction is clear, as it is here, under the undisputed facts, it is our duty to issue a preliminary injunction." Id. at 406, 409. Following the rationale of the *Israel* doctrine, I would hold that when the Commonwealth comes before a court of equity and can show a *clear and continuing* violation of the Air Pollution Control Act, or the regulation adopted pursuant thereto, the presumption arises that the Commonwealth is entitled to preliminary relief because of the violation of the legislative directive to halt the contamination of our air resources, and the irreparable harm presumably caused by the pollution. When this presumption arises, the burden of proof shifts to the defendant, and unless the defendant can come forward with competent scientific evidence to show that the emissions, although in violation of the regulatory standard, are harmless, the Commonwealth is entitled to preliminary relief.

Applying this to the instant case I would reverse the lower court, because the appellees have not rebutted the evidence of the Commonwealth that clearly shows a continuing violation of the statute, which gives rise to the presumption of irreparable harm,[5] and order the court to issue a decree in accordance with this opinion.

---

[5] The reasoning of this opinion does not in any way contradict our ruling in *Schwab v. Pottstown Boro.*, 407 Pa. 531, 180 A. 2d 921 (1962). The facts of the instant case fit within the *Schwab* test as follows: (1) The Commonwealth's right to relief is clear

488

Mr. Justice O'Brien and Mr. Justice Roberts join in this dissent.

---

because there is an obvious violation of a statute enacted to protect the health, safety and welfare of the citizens of the Commonwealth; (2) There is an urgent necessity to grant the injunction because of the quantity and quality of the air contamination, and, there is irreparable harm under the *Israel* doctrine, which cannot be compensated for by damages; and (3) Greater injury is being done to the citizens of the Commonwealth at large, and to the citizens in the immediate area of the air contamination source by disturbing their peaceful use and enjoyment of their homes and property, and obviously endangering their health, than would be done to the appellees, who are carrying on an unlawful activity. See Act of 1960, supra, 35 P.S. §4008 (Supp. 1971).